## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| NATALIE VALLECORSA, | ) | |
| | ) | |
| Plaintiff, | ) | 2:19-CV-1495-NR |
| | ) | |
| v. | ) | |
| | ) | |
| ALLEGHENY COUNTY, STEVEN | ) | |
| PILARSKI, and REBECCA | ) | |
| FRAZIER, | ) | |
| | ) | |
| Defendants. | ) | |

### OPINION

**J. Nicholas Ranjan, United States District Judge**

In our current social-media age, there is one indisputable truth: nothing you say on the internet is private. Plaintiff Natalie Vallecorsa, unfortunately, learned this the hard way.

Ms. Vallecorsa previously served as a 911 dispatcher for Allegheny County. The County terminated her employment following a public outcry over a private conversation she engaged in on Facebook about the publicized police shooting of a young Black teenager. Ms. Vallecorsa's Facebook conversation was, at least to her, private. But someone screen-shotted it and tagged her employer, which led to a strong public response and then eventually to her termination.

In this lawsuit, Ms. Vallecorsa claims her speech, which she made as a private citizen and which addressed a matter of public concern, was protected by the First Amendment such that her termination for that speech was unconstitutional. After careful consideration, the Court disagrees.

Applying the familiar *Pickering* balancing test, the Court finds that the County's interests in avoiding disruption of its 911 operations outweigh the importance of Ms. Vallecorsa's speech. This is largely because of the law-enforcement

and public-facing nature of the County's operations and the evidence it has put forward showing somewhat significant disruption in the days following Ms. Vallecorsa's Facebook posts.  Because the Court determines, as a matter of law, that Ms. Vallecorsa's speech ultimately is not protected under the First Amendment, all of her claims for First Amendment retaliation must fail.  So judgment will be entered against her and in favor of Defendants.

## FACTUAL BACKGROUND

### I.    Ms. Vallecorsa's employment, and her June 2018 speech.

Because the issues now before the Court arise on cross-motions for summary judgment and the Court ultimately finds in Defendants' favor, the Court construes the facts here in the light most favorable to Ms. Vallecorsa.

Beginning in September 2015, Ms. Vallecorsa worked as a full-time telecommunications officer for the Allegheny County Department of Emergency Services, a position of public employment.  ECF 51-3, JA 774, 41:13-18.  In that position, Ms. Vallecorsa was responsible for answering 911 phone calls from people in need of emergency assistance, as well as relaying information to and dispatching law enforcement, the fire department, and emergency medical services personnel.  *Id.* at 779-80, 46:2-47:9.

On June 19, 2018, a young Black man named Antwon Rose was shot and killed while fleeing the police after a traffic stop in East Pittsburgh.  ECF 1, ¶ 10; ECF 45, ¶¶ 3-4; ECF 50, pp. 2-3; ECF 57, p. 3.  The incident sparked immediate protests both locally and nationally, and generated conversation and debate by media figures, politicians, and the public across many mediums, including social media.  *Id.*[1]

---

[1]  *See, e.g.*, Matt Stevens, Melissa Gomez, & Christina Caron, *Police Killing of Antwon Rose, 17, in East Pittsburgh Prompts Protests*, N.Y. Times (June 21, 2018), https://www.nytimes.com/2018/06/21/us/antwon-rose-police-killing-protests.html; Doug Stanglin, *Pittsburgh protesters shut down highway for hours over fatal police shooting of unarmed teen Antwon Rose*, USA Today (June 22, 2018),

On June 24, 2018, Ms. Vallecorsa engaged in a conversation on Facebook addressing the protests for justice for Antwon Rose.  ECF 1, ¶¶ 11-12; ECF 45, ¶ 5; ECF 45-1; ECF 50, pp. 3-4; ECF 57, p. 3.  The conversation is as follows:

| | |
|---|---|
| [Person 1]: | Still trying to figure out where all these protesters were When officer Shaw was killed in new ken…. not a peep tho!!!! |
| Ms. Vallecorsa: | It's a joke. #backtheblue |
| [Person 2]: | Honestly why don't they arrest them all or shut off their food stamp cards…this is seriously ridiculous…if he was innocent then why run |
| Ms. Vallecorsa: | Thankkkk you!!! So innocent that he had an empty chamber on him && was doing community service hours for something he did prior! [thoughtful emoji] |
| [Person 2]: | Natalie Vallecorsa right! If his ass would've stayed planted nobody would've been blocking traffic or rioting and this wouldn't exist…this generation has a lot to learn about what's right and what's wrong…the entire country has everything twisted on how to look at things and honestly I'm tired of surrounding myself with such people [sad face emoji] |
| Ms. Vallecorsa: | [100 emoji, 100 emoji, 100 emoji] couldn't agree anymore! |
| [Person 2]: | Natalie Vallecorsa the assistance they receive monthly will now pay what the city will be forced to pay from the loss because of rioting…cut their support and the rioting ends [smile face emoji] |

---

https://www.usatoday.com/story/news/2018/06/22/police-shooting-pittsburgh-area-highway-shut-down-protest-black-teens-killing/724754002/.



ECF 45-1.

It is undisputed for purposes of the parties' cross-motions that Ms. Vallecorsa made these comments in her capacity as a private citizen while she was off-duty. ECF 50, p. 4; ECF 57, p. 11 n.1. While Ms. Vallecorsa's Facebook account was private, such that she believed only her "Facebook friends" could view her exchange, an individual viewed the post, took a screenshot of it, and re-posted it himself and tagged the Allegheny County Emergency Services Facebook page. ECF 50, pp. 4-6; ECF 51-1, JA 308. Though the individual did not know Ms. Vallecorsa and was not her

"friend" on Facebook, he knew her place of employment because Ms. Vallecorsa identified herself as a 911 dispatcher for the County on her Facebook account. ECF 51-3, JA 798, 65:8-11.

## II.   Fallout from the Facebook exchange.

Ms. Vallecorsa's Facebook exchange circulated in the early hours of June 25, 2018, reaching other Facebook users, as well as Ms. Vallecorsa's co-workers, direct supervisors, and co-Defendant Rebecca Frazier, Deputy Chief of Emergency Services. ECF 50, pp. 5-6; ECF 57, p. 4; ECF 51-3, JA 851, 118:15-20.

Ms. Vallecorsa, who had been made aware of the shared Facebook conversation, came into work on June 25 and spoke to Deputy Frazier because she was upset that her comments were circulated, and was generally regretful and worried about her safety. ECF 50, p. 6; ECF 51-3, JA 859-62, 126:15-129:23. Deputy Frazier instructed Ms. Vallecorsa to file a police report with her local department given her fears, which Ms. Vallecorsa did. ECF 50, p. 6. Ms. Vallecorsa went on to work a full shift that day. *Id.* She had "pass days" on June 26 and 27, and so did not work on those days. *Id.*; ECF 57, p. 21 n.3.

But the issues at Emergency Services caused by Ms. Vallecorsa's comments had only just begun. Just a few hours after Ms. Vallecorsa's conversation was tagged to the Emergency Services Facebook page, Deputy Frazier began receiving emails from her staff expressing anxiety about working with "racist coworkers" and advising that the comments were circulating on social media. ECF 50, pp. 5-6; ECF 51-1, JA 106:11-107:7, 346-51; ECF 57, pp. 4-5. A shift commander notified her that other dispatchers were concerned for their safety because of Ms. Vallecorsa's exchange going viral. ECF 50, p. 6; ECF 51-1, JA 319-328; ECF 57, p. 5.

The public also started directly complaining to—and chastising—the department. From June 25 to 27, Deputy Frazier herself fielded at least 11 telephone calls from the public expressing disbelief and outrage over Ms. Vallecorsa's exchange

and questioning the integrity and abilities of the center to perform its duties given the apparent attitudes of its employees.  ECF 50, p. 7; ECF 51-1, JA 89:4-92:25, 169:5-170:1; ECF 57, p. 5.  One caller instructed Deputy Frazier to expect a protest at the 911 command center.  ECF 50, p. 7; ECF 57, p. 5; ECF 51-1, JA 203:1-4, 309.  Though no protest ultimately materialized, Deputy Frazier conducted risk management meetings in preparation for potential disruptions that would inhibit staff from answering 911 calls.  ECF 51-1, JA 203:1-204:23.  Other callers doubted they would receive ambulatory relief if they called 911 given the apparent bias of department employees like Ms. Vallecorsa.  ECF 50, p. 7; ECF 51-1, JA 343-44; ECF 57, p. 5.  Yet another caller advised that Deputy Frazier should expect 200 more calls about the exchange.  ECF 51-1, JA 309; ECF 57, p. 6.  Other personnel at the center likewise received complaints—at least one caller tied up the 911 emergency line to complain about Ms. Vallecorsa's exchange.  ECF 51-1, JA 95:19-96:3.

In addition to telephonic complaints, the department received complaints on Facebook, at least one of which also expressed disbelief about receiving emergency care from 911 dispatch.  ECF 50, pp. 7-8; ECF 51-1, JA 343; ECF 57, pp. 6-7.  Of course, these are just the individuals who openly complained and doubted the capabilities of the department.  It is not clear how many people actually saw the exchange—and came to doubt the department's ability to render emergency services in light of Ms. Vallecorsa's exchange.[2]  Social media posts tend to spread like wildfire—as even Ms. Vallecorsa acknowledged.  ECF 51-3, JA 847, 114:3-5.

_____

[2] Ms. Vallecorsa's reaction to seeing just how viral her conversation had spread is a testament to the number of people it reached, "I went on Facebook, and I was like, what the hell?  This got blown out of proportion. . . .  Because if you would [ ] type in that hashtag, that's what I seen, and I was like, oh, my God."  ECF 51-3, JA 852, 119:14-19.

### III.   The County's termination of Ms. Vallecorsa's employment.

On June 27, 2018, the County held a *Loudermill* hearing[3] concerning Ms. Vallecorsa's online comments.  ECF 50, p. 8; ECF 57, p. 7.  Deputy Frazier determined that the posts violated several department policies,[4] stirred public outcry and mistrust in the department, and disrupted and risked further disruption to the dispatch center's ability to render emergency services to the public.  *Id.*

As Deputy Frazier did not possess the authority to make final employment decisions, she consulted with co-Defendant Steven Pilarski, the Deputy County Manager.  ECF 50, p. 8; ECF 57, pp. 7-8.  During that consultation, Deputy Frazier recommended that Ms. Vallecorsa's employment be terminated.  *Id.*  Mr. Pilarski then spoke with County Manager William McKain about the situation.  *Id.*  During their conversation, they decided that Ms. Vallecorsa's comments could be perceived as racist, violated department policies, caused a disturbance at the 911 dispatch center, and fomented public distrust in the department, including doubt that citizens would receive ambulatory care.  ECF 51-2, JA 474-75, 62:5-63:10.  Mr. McKain decided to terminate Ms. Vallecorsa's employment.  ECF 50, p. 2; ECF 57, p. 8.

The County terminated Ms. Vallecorsa's employment on June 27, 2018.  ECF 51-1, JA 375.  Her termination letter makes clear that the reason for her termination was her Facebook comments.  *Id.*

---

[3] Under *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532 (1985), a public employer is required to hold a termination hearing to comport with the Due Process Clause of the U.S. Constitution.

[4] One such policy stated: "Conduct unbecoming an employee is any conduct which adversely affects the morale or efficiency of the Department or which has a tendency to destroy public respect for its employees or to diminish confidence in the operations of the Department. Employees shall conduct themselves in a respectful and professional manner at all times."  ECF 51-1, JA 273, ¶ 502.

Ms. Vallecorsa filed this lawsuit, challenging her termination as violating her First Amendment right to freedom of speech.  ECF 1, ¶¶ 15-20.  She sued Deputy Frazier and Mr. Pilarski in their capacities as officers of the County for First Amendment retaliation pursuant to 42 U.S.C. § 1983, and the County under the *Monell* doctrine for the alleged unconstitutional practices and policies of the individual defendants in connection with the decision to terminate her employment. *Id.* at ¶¶ 15-29.

The parties filed cross-motions for summary judgment on the claims in the complaint.  After briefing and oral argument, the matter is ready for disposition.

## LEGAL STANDARD

Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  At summary judgment, the inquiry is whether the evidence presents "a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).  In making this determination, a court must "consider all evidence in the light most favorable to the party opposing the motion." *A.W. v. Jersey City Pub. Schs.*, 486 F.3d 791, 794 (3d Cir. 2007) (citation omitted).

If the moving party shows a lack of genuine issue of material fact, "the non-moving party must rebut the motion with facts in the record and cannot rest solely on assertions made in the pleadings, legal memoranda, or oral argument." *Berckeley Inv. Grp. Ltd. v. Colkitt*, 455 F.3d 195, 201 (3d Cir. 2006) (cleaned up).  If the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden at trial," summary judgment is appropriate. *Celotext Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

"The rule is no different where there are cross-motions for summary judgment. The parties' filing of cross-motions does not constitute an agreement that if one is rejected the other is necessarily justified.  But the Court may resolve cross-motions for summary judgment concurrently.  When doing so, the Court views the evidence in the light most favorable to the non-moving party with respect to each motion." *See Smail Imports, Inc. v. RMJ, Motors, Inc.*, No. 20-109, 2021 WL 3173164, at *4 (W.D. Pa. July 27, 2021) (Ranjan, J.) (cleaned up), *aff'd*, No. 21-2605, 2022 WL 3098666 (3d Cir. Aug. 4, 2022).

## DISCUSSION & ANALYSIS

The parties agree that there is no dispute of material fact here.  Instead, this case hinges, as a threshold matter, on whether Ms. Vallecorsa's speech was protected under the First Amendment.  If it was not, then her claims fail at the outset, and judgment must be entered in favor of Defendants.

As discussed below, the Court finds the at-issue speech was not protected under the First Amendment, even when viewed in the light most favorable to Ms. Vallecorsa.  Ms. Vallecorsa therefore cannot make out a *prima facie* case of First Amendment retaliation, and summary judgment must be granted for Defendants.

**I.     Ms. Vallecorsa cannot establish that her speech was protected by the First Amendment as a matter of law.**

"A State may not discharge an employee on a basis that infringes that employee's constitutionally protected interest in freedom of speech."  *Rankin v. McPherson*, 483 U.S. 378, 383 (1987) (citation omitted).  That said, a citizen who enters government service must accept certain limitations on his or her First Amendment freedom.  *Baloga v. Pittston Area Sch. Dist.*, 927 F.3d 742, 753 (3d Cir. 2019); *see also Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006) ("When a citizen enters government service, the citizen by necessity must accept certain limitations on his or her freedom." (citation omitted)).

In this context, "[t]o establish a First Amendment retaliation claim, a public employee must show that (1) his speech is protected by the First Amendment and (2) the speech was a substantial or motivating factor in the alleged retaliatory action, which, if both are proved, shifts the burden to the employer to prove that (3) the same action would have been taken even if the speech had not occurred." *Dougherty v. Sch. Dist. of Phila.*, 772 F.3d 979, 986 (3d Cir. 2014) (citation omitted).

That first element is the only one at issue here, and the Court may appropriately determine whether, as a matter of law, the employee's speech is protected under the First Amendment at the summary-judgment stage. *See Azzaro v. Cnty. of Allegheny*, 110 F.3d 968, 975 (3d Cir. 1997) ("We must first inquire whether Azarro's reports to Fox and Sirabella were protected by the First Amendment. This is a question of law."); *Murphy v. Orloff*, No. 04-3618, 2006 WL 2060643, at *2 (E.D. Pa. July 20, 2006) ("The Court begins by determining whether Plaintiff, by signing a nominating petition, engaged in conduct that is protected by the First Amendment.").

"In order for his or her speech to rise to the level of constitutionally protected expression, the [public] employee must speak as a citizen (and not as an employee), the speech must involve a matter of a public concern, and the government must lack an adequate justification for treating the employee differently than the general public based on its needs as an employer under the *Pickering* balancing test." *Munroe v. Central Bucks Sch. Dist.*, 805 F.3d 454, 466 (3rd Cir. 2015) (cleaned up). "The *Pickering* balancing test requires the courts to balance the interests of the employee, as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Id.* (cleaned up). This balancing test is "a fact-intensive inquiry that requires consideration of the entire record, and must yield different results depending on the relative strengths of the issue of public concern and the employer's interest." *Miller v. Clinton Cnty.*, 544 F.3d 542, 548 (3d Cir. 2008).

The County assumes for purposes of summary judgment that Ms. Vallecorsa spoke as a private citizen and that her statements involved a matter of public concern. ECF 57, p. 11, n.1.  The Court agrees.

So, this case comes down to the balancing analysis of the *Pickering* test: whether the County's justifications for terminating Ms. Vallecorsa outweigh her interest in making the at-issue statements.  After balancing the competing interests, the Court finds that the County's justifications for termination outweigh Ms. Vallecorsa's speech interests.[5]

### A.   The County's interest in promoting efficiency in rendering emergency services outweighs Ms. Vallecorsa's interest in commenting upon matters of public concern.

On the employee's side of the *Pickering* balance, a court "must consider the interest of both [the employee] and the public in the speech at issue."  *Munroe*, 805 F.3d at 472 (cleaned up).  And on the employer's side, a court should consider the employer's concerns about efficiency and avoiding disruptions, including consideration of the employer's prerogative in removing employees whose conduct impairs performance.  *Miller*, 544 F.3d at 548; *Munroe*, 805 F.3d at 472.

Importantly, courts must not consider the at-issue speech "in a vacuum; the manner, time, and place of the employee's expression are relevant, as is the context in which the dispute arose."  *Rankin*, 483 U.S. at 388 (citations omitted).  "[T]he inquiry necessarily involves a sliding scale" where "the amount of disruption a public

---

[5] "*Pickering* balancing" has come under some attack recently.  *See Bennett v. Metro. Gov't*, 977 F.3d 530, 553 (6th Cir. 2020) (Murphy, J., concurring) ("In my respectful view after struggling with the task, *Pickering's* instructions to engage in open-ended balancing do not provide helpful guidance to resolve concrete cases."); *Amalgamated Transit Union Loc. 85 v. Port Auth. of Allegheny Cnty.*, 39 F.4th 95, 110 (3d Cir. 2022) (Porter, J., concurring) (noting that the Court could avoid applying *Pickering* balancing by simply "applying basic First Amendment principles").  This Court is, of course, bound to apply *Pickering*.

employer has to tolerate is directly proportional to the importance of the disputed speech to the public." *Miller*, 544 F.3d at 549 n.2.

### 1.   Ms. Vallecorsa's statements are owed some limited degree of protection.

The Court starts the balancing act by examining the "importance of the disputed speech to the public." *Id.* As noted above, there are two driving considerations: content and context.

With respect to the content of the speech, the parties dispute the significance of Ms. Vallecorsa's speech. Ms. Vallecorsa argues her Facebook comments must be afforded "the highest rung" of First Amendment protection because they "directly involved social and political issues that gripped Allegheny County and captured national media attention." ECF 50, p. 13. She further argues that any inappropriate or controversial aspect of her speech does not affect its highest rung protection because the speech addressed matters of public concern. *Id.* at 14 (citing *Munroe*, 805 F.3d at 467 ("The arguably inappropriate or controversial character of a statement is irrelevant to the question whether it deals with a matter of public concern." (cleaned up))). The County replies that, in the public employment context, the highest rung of First Amendment protection must be reserved for speech concerning government impropriety. ECF 57, p. 13.

The Court agrees with Ms. Vallecorsa, and finds that the content of the speech, viewed in isolation, deserves a high level of protection. Construing her comments in a light most favorable to her, Ms. Vallecorsa complained about certain race-related issues in society and also the disparate treatment of police officers, and she made comments supporting the police ("back the blue").[6] That some could view this speech

---

[6] One aspect of the Facebook chain of messages warrants some explanation. In the Facebook chain, someone makes a potentially offensive comment that says: "Honestly why don't they arrest them all or shut off their food stamp cards. . . this is seriously ridiculous. . . if he was innocent then why run." Ms. Vallecorsa replies: "Thankkkk

as offensive is irrelevant as it pertains to the level of protection afforded to the speech, because the First Amendment does not permit viewpoint discrimination, including in the context of *Pickering*.  *See Amalgamated Transit Union Loc. 85 v. Port Auth. of Allegheny Cnty.*, 39 F.4th 95, 108 (3d Cir. 2022) ("Concern over viewpoint discrimination is the very reason *Pickering* rejected the older rule that the First Amendment does not protect government-employee speech.").   And the County may be right that speech about government mismanagement typically is at or near the "highest rung,"[7] but speech about race and policing in America isn't far from it.  *See, e.g.*, *Spetalieri v. Kavanaugh*, 36 F. Supp. 2d 92, 104 (N.D.N.Y. 1998) ("A discussion regarding racial relations or discrimination is a matter of public concern entitled to the full protection of the First Amendment.").

But content isn't the only consideration.  As the Supreme Court has said, context matters, too.  *See Rankin*, 483 U.S. at 388.  Here, the context of the speech somewhat undermines its importance.

For example, Ms. Vallecorsa's speech wasn't made in a traditional public forum devoted to assembly and debate.  *See, e.g.*, *Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n*, 460 U.S. 37 (1983) (streets and parks); *Perry v. Sindermann*, 408 U.S. 593

---

you!!! So innocent that he had an empty chamber on him && was doing community service hours for something he did prior!"  The Court, construing this in a light favorable to Ms. Vallecorsa, reads Ms. Vallecorsa's reply as pertaining to the second part of the prior message ("if he was innocent then why run"), and not to the first part of the message about "arrest them all or shut off their food stamp cards."  So, again, Ms. Vallecorsa's comments were focused on the culpability of Antwon Rose, as part of her other comments about policing, disparate treatment of police, and these problems in society more generally.

[7] "Speech involving government impropriety occupies the highest rung of First Amendment protection."  *See Swineford v. Snyder Cnty.*, 15 F.3d 1258, 1274 (3d Cir. 1994).  That said, even that speech is not immune from an employer's scrutiny, "[a] balance must be struck between the employee's right to speak and the employer's need effectively to discharge its public responsibilities."  *Id.*

(1972) (college governing board meeting); *Pesek v. City of Brunswick*, 794 F. Supp. 768, 785 (N.D. Ohio 1992) (city council meeting). It wasn't made in a newspaper. *See, e.g.*, *Pickering v. Bd. of Educ.*, 391 U.S. 563 (1968). It wasn't made in the workplace in the context of a complaint about certain workplace conduct. *See, e.g.*, *Connick v. Myers*, 461 U.S. 138 (1983). It wasn't made in a public online platform, such as in the President's official Twitter feed. *See, e.g.*, *Knight First Amend. Inst. at Columbia Univ. v. Trump*, 302 F. Supp. 3d 541 (S.D.N.Y. 2018), *aff'd*, 928 F.3d 226 (2d Cir. 2019), *cert. granted, judgment vacated sub nom.*, *Biden v. Knight First Amend. Inst. at Columbia Univ.*, 209 L. Ed. 2d 519, 141 S. Ct. 1220 (2021); *see also Dingwell v. Cossette*, 327 F. Supp. 3d 462 (D. Conn. 2018) (police department Facebook page). It also wasn't made on a publicly available blog or website. *See, e.g.*, *Munroe*, 805 F.3d at 454. These are all contexts where courts might find the speech to be deserving of something at least closer to "higher-rung" protection in balancing the speech against disruption.

Rather, the speech here was made in comments of private individuals' Facebook profiles, including on Ms. Vallecorsa's own Facebook profile, which was set to private. This doesn't suggest that speech on public matters between "Facebook friends" shouldn't be protected at all, but that, in the *Pickering* balance, it cannot warrant the type of "highest-rung" protection that Ms. Vallecorsa seeks.[8]

Thus, in sum, in considering the content and context of the speech, the Court finds that it is speech that warrants only a limited degree of protection, and thus the County's showing of disruption here need not be as strong to justify the termination

---

[8] In some cases, this cuts in the employee's favor. For example, speech on a matter of public concern made in a private setting between friends or co-workers may not create much, if any, disruption to the employer—and so the balance may tip in favor of the employee. *See, e.g., Rankin*, 483 U.S. at 389. But, as discussed below, Ms. Vallecorsa's speech between Facebook friends went viral, and led to somewhat significant disruption and non-speculative threats of additional disruption.

of Ms. Vallecorsa's employment. *See Munroe*, 805 F.3d at 473 ("Given our assessment of the interests of Munroe and the public in her speech, Defendants were not required to make an especially vigorous showing of actual or potential disruption in this case.").

However, for reasons discussed below, the Court finds that even assuming Ms. Vallecorsa's speech was considered to be at the "highest rung," which the Court will now assume only for purposes of the pending motions, the evidence of actual disruption here and the nature of the County's operations support the County's decision to terminate Ms. Vallecorsa's employment for her expression. *See id.* at 473 ("However, even if we were to assume arguendo that her speech possesses the highest value, we would still conclude that Defendants met their burden. Simply put, Plaintiff's speech, in both effect and tone, was sufficiently disruptive so as to diminish any legitimate interest in its expression, and thus her expression was not protected." (cleaned up)).

> **2.    The County's interest in promoting efficiency in its public-facing, law-enforcement functions outweighs Ms. Vallecorsa's First Amendment interest.**

Having established the level of protection owed to Ms. Vallecorsa's statements, the Court must balance her interest against the County's "legitimate and countervailing interest, as an employer, in promoting workplace efficiency and avoiding workplace disruption." *Munroe*, 805 F.3d at 472 (cleaned up). The County need not show actual disruption if it establishes that disruption is likely to occur because of the at-issue speech. *Id.* "While the inquiry varies given the nature of the speech at issue, courts typically consider whether the speech impairs discipline or employee harmony, has a detrimental impact on close working relationships requiring personal loyalty and confidence, impedes the performance of the speaker's duties, or interferes with the enterprise's regular operations." *Id.*

The context of Ms. Vallecorsa's employment is critically important to this balancing. Ms. Vallecorsa served as a 911 dispatcher for Allegheny County Department of Emergency Services, a public-facing agency that, if not technically a law-enforcement agency, works intimately with law enforcement. The nature of that agency's mission and Ms. Vallecorsa's former position within that agency tip the *Pickering* balance in favor of the County.

As the Third Circuit has recognized, law-enforcement agencies are afforded "wide latitude to regulate an employee's speech when that speech impacts areas such as discipline, morale, and uniformity within the force." *Meenan v. Harrison*, 264 F. App'x 146, 151 (3d Cir. 2008) (collecting cases). At least one circuit has extended that wide latitude specifically to 911 dispatch, *Bennett*, 977 F.3d at 542-45, while other courts have extended that latitude to first responder-type government agencies. *See, e.g., Grutzmacher v. Howard Cnty.*, 851 F.3d 332, 348 (4th Cir. 2017) (fire department); *Waters v. Churchill*, 511 U.S. 661, 675 (1994) (plurality opinion) ("When someone who is paid a salary so that she will contribute to an agency's effective operation begins to do or say things that detract from the agency's effective operation, the government employer must have some power to restrain her.").

The Allegheny County Department of Emergency Services is the type of agency that is owed considerable deference in managing its employees, and in turn, their speech. As 911 telecommunications officers, Ms. Vallecorsa and her co-workers served as "the first line of help" to the public by communicating with 911 callers over the phone, gathering information about their emergency, and relaying that information to the appropriate emergency response, be it law enforcement, emergency medical services, or the fire department. ECF 51-3, JA 778-80, 45:6-47:9. They were likewise responsible for the safety and welfare of law enforcement and other emergency services that they dispatched. *Id.* at JA 779-80, 46:18-47:3. The

County's interest in ensuring the seamless provision of emergency services is significant, and disruption at the front end could prove problematic.

And, indeed, the facts and circumstances following Ms. Vallecorsa's online comments bear out that reality. As a result of the public distrust in the department and Ms. Vallecorsa as a 911 dispatcher, the dispatch center fielded at least 11 calls (at least one of which tied up the 911 assistance line) and was told to expect an additional 200 calls; received internet messages and complaints; and faced a potential disruptive protest.[9] Deputy Frazier found the posts made the department's job more difficult, "The public outcry and mistrust interrupted the mission and vision of my department, yes. I cannot have the public not trust emergency services or 911, then we cannot do our job if that's the case." ECF 51-1, JA 164:1-5. Mr. Pilarski and Mr. McKain reviewed the posts and determined that they could be perceived as offensive such that they caused "problems" and "disturbance[s] at 911," and violated work orders and policies. ECF 51-2, JA 473, 61:9-17; *id.* at JA 474, 62:10-19. Among the "problems" and "disturbances" was that "people were calling 911, asking if an ambulance would pick them up." *Id.* at JA 475, 63:1-2.

The dispatch center faced disruptions among its staff as well. Several employees, including Ms. Vallecorsa, reported feeling unsafe following the public

---

[9] Ms. Vallecorsa in her brief describes the full extent of the protests that were taking place just a few days prior to her posts, "The protests required Defendant County to mobilize considerable resources to accommodate multiple public protests, including dispatching uniformed police. The protests shut down traffic in multiple parts of the City of Pittsburgh. The protests in fact prompted the Department of Emergency Services to issue a staffing memorandum recommending their employees take certain safety precautions." ECF 50, p. 3 (citing ECF 51-2, JA 446-48). That a caller threatened a protest at the dispatch center within this context was no small matter.

outcry over the Facebook comments.[10]  ECF 51-1, JA 309, 339-40; ECF 51-3, JA 864-65, 131:15-132:12; ECF 51-3, JA 982.  And at least one employee expressed discomfort about continuing to work with Ms. Vallecorsa.  ECF 51-1, JA 346-51.  The potential external danger, as well as the discord brewing internally among coworkers, risked disruption of morale and teamwork, and therefore the smooth functioning of the center.  For a first responder call center that coordinates with law enforcement to provide services to the public, the need for unity and morale cannot be understated.  *See Kelley v. Johnson*, 425 U.S. 238, 246 (1976) ("Here the county has chosen a mode of organization which it undoubtedly deems the most efficient in enabling its police to carry out the duties assigned to them under state and local law.  Such a choice necessarily gives weight to the overall need for discipline esprit de corps, and uniformity.").  These actual and potential internal and external disturbances are exactly the sort that could harm or impede a public-facing emergency services entity that relies on public trust to function effectively. *Bennett*, 977 F.3d at 544. ("The diverse constituents of Metro Government need to believe that those meant to help them in their most dire moments are fair-minded, unbiased, and worthy of their trust.").

Ms. Vallecorsa does not dispute the County's evidence but argues that any actual or potential disruptions that did occur cannot outweigh Ms. Vallecorsa's interest in making the at-issue speech.  ECF 58, p. 6.   Ms. Vallecorsa specifically argues that Deputy Frazier's reliance "upon a total of 12 complaints from the public and potential disruption as the basis for terminating Ms. Vallecorsa" is plainly insufficient to outweigh Ms. Vallecorsa's speech.  *Id.*  The Court disagrees.

---

[10] Though tensions were evidently high at the dispatch center as a result of the protests in the days leading up to the Facebook posts, no employee complained about feeling unsafe.  ECF 51-1, JA 61:6-14.

Even assuming it experienced only limited actual disruption, the County points with specificity to numerous potential disruptions both internally and externally that, if they had materialized, would have caused additional substantial disruptions. *See Rankin*, 483 U.S. at 389; *Waters*, 511 U.S. at 677; *Munroe*, 805 F.3d at 479; *Moser v. Las Vegas Metro. Police Dep't*, 984 F.3d 900, 910 (9th Cir. 2021); *Moore v. City of Wynnewood*, 57 F.3d 924, 934 (10th Cir. 1995). Nothing more was needed for the County to act. *Connick*, 461 U.S. at 152 ("[W]e do not see the necessity for an employer to allow events to unfold to the extent that the disruption of the office and the destruction of working relationships is manifest before taking action."). Though the County's interest in preventing actual or potential disruption is not determinative of itself, it does significantly tip the balance towards the County given the particular speech at issue and its full context. *See Munroe*, 805 F.3d at 478 ("The District Court . . . appropriately took into account the competing interests and then determined that the speech at issue here was not protected because the disruption diminished any legitimate interest in its expression.").

The other important consideration is the compressed timing of the events here. Consider this:

- June 19: Police shot and killed Mr. Rose. Widespread protests immediately ensued.

- June 24: Ms. Vallecorsa made her Facebook posts.

- June 25-27: Disruption and complaints occurred at the 911 Center.

- June 27: The County terminated Ms. Vallecorsa's employment.

The Court notes the timing because the sequence of events here, including the instances of disruption, essentially happened in the pressure cooker of about a week

within the shooting.  Within that high-pressure environment, the evidence of actual and potential disruption here must be viewed as much more pronounced.[11]

In sum, even if Ms. Vallecorsa's Facebook comments are owed "highest-rung protection" under the First Amendment, the County was justified here.  "The guaranty of freedom of speech contained in the First Amendment does not guarantee him who speaks immunity from the legal consequences of his verbal actions." *N.L.R.B. v. M.E. Blatt Co.*, 143 F.2d 268, 274 (3d Cir. 1944).

Upon consideration of the entire record in the light most favorable to Ms. Vallecorsa, the Court concludes that Ms. Vallecorsa's interest in commenting on matters of public concern does not outweigh the County's interest in providing emergency services without disruption to the public under the *Pickering* test.  The Court therefore finds no violation of the First Amendment as a matter of law, and all of Ms. Vallecorsa's claims fail.

---

[11] Ms. Vallecorsa also complains that the County's actions amount to a "Heckler's Veto" for what some may view as her offensive or controversial speech.  To begin with, this is more of a complaint about *Pickering*, which some have concluded constitutionalize the Heckler's Veto.  *See* Randy J. Kozel, *Free Speech and Parity: A Theory of Public Employee Rights*, 53 Wm. & Mary L. Rev. 1985, 2019 (2012) ("The balancing test set forth in *Pickering* assumes a markedly different posture.  Through its contemplation of scenarios in which the disruption caused by speech provides a lawful basis for discipline, the *Pickering* test can be understood as constitutionalizing a 'heckler's veto' for controversial expressions."); *Bennett*, 977 F.3d at 554 (Murphy, J., concurring) ("*Pickering* has been the law for decades, yet it remains unclear how much its balancing constitutionalizes a heckler's veto for controversial expressions—even expressions that occur on the employee's personal time." (cleaned up)).  The Third Circuit addressed the Heckler's Veto issue in *Munroe*, and found that complaints by stakeholders (there, students and parents of the Plaintiff teacher) would not amount to a Heckler's Veto.  Under that logic, the complaints by the public in this case (potential patrons of the 911 dispatch center) would seem to fit within the Third Circuit's distinction.  Truth be told, the distinction drawn in *Munroe*, at least as applied here, is as fine as a grain of sand, and the reality is that there is a commensurate relationship between controversial speech and disruption, which is essentially baked into *Pickering*.  In the end, this is an issue for the Supreme Court to decide, if it ever re-visits *Pickering*.

II.     **The Court need not address the parties' remaining arguments.**

In the absence of a constitutional violation, the Court need not reach the additional elements of Ms. Vallecorsa's Section 1983 claim, the County's qualified-immunity defense for the individual defendants, or Ms. Vallecorsa's *Monell* claim. *See Startzell v. City of Phila.*, 533 F.3d 183, 204 (3d Cir. 2008) ("Because we have found that there was no violation of Appellants' constitutional rights, we need not reach the claim against the City under *Monell*."); *Benedict v. Sw. Pa. Human Servs., Inc.*, 98 F. Supp. 3d 809, 827 n.17 (W.D. Pa. 2015) (Hornak, C.J.) ("[B]ecause the Court concludes there has been no constitutional violation, it need not reach the arguments pertaining to qualified immunity, municipal liability, or supervisory liability.").

## <u>CONCLUSION</u>

For the reasons discussed above, Ms. Vallecorsa's motion for summary judgment will be **DENIED**, and Defendants' motion for summary judgment will be **GRANTED**.  Judgment will be **ENTERED** in favor of Defendants on all claims in the Complaint.  An appropriate order follows.

DATED this 15th day of November, 2022.

BY THE COURT:

*/s/ J. Nicholas Ranjan*
United States District Judge